FILED

07 OCT 29 PM 1:10

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY: _____ DEPUTY

1  Jonathan A. Paul (Bar No. CA 216455)
   THE TECH LAW GROUP, P.C.
2  110 West C Street, Suite 2200
   San Diego, CA 92101
3  Telephone: (619) 881-2305
   Facsimile: (619) 696-8795
4
   Attorneys for Plaintiff
5  JEAN-CLAUDE DEMOSTHENIDY

6

7

8
                    UNITED STATES DISTRICT COURT FOR
9
                    THE SOUTHERN DISTRICT OF CALIFORNIA
10
                                            '07  2050 WQH  (BLM)
11  JEAN-CLAUDE DEMOSTHENIDY, an      )  Case No.
    individual doing business as INTERACTIVE  )
12  DESIGN SYSTEMS,                   )  COMPLAINT FOR DAMAGES AND FOR
                                      )  DECLARATORY RELIEF
13                  Plaintiff,        )
                                      )  DEMAND FOR JURY TRIAL
14          vs.                       )
                                      )
15                                    )
    FINLEY ENGINEERING GROUP, INC., a )
16  Florida corporation; DOES 1 through 10,  )
    inclusive,                        )
17                                    )
                    Defendants.       )
18  _____  )

19

20       Plaintiff Jean-Claude Demosthenidy, (hereinafter referred to as "Plaintiff" or "IDS")

21  hereby complains of Defendant Finley Engineering Group, Inc. (hereinafter referred to as

22  "Defendant" or "Finley"), and alleges as follows:

23                              **THE PARTIES**

24       1.      Jean-Claude Demosthenidy is an individual doing business as Interactive Design

25  Systems, having his office and principal place of business at 16885 Via Del Campo Court, Suite

26  207, San Diego, California 92127.

27       //

28       //

                                        1
                                   **COMPLAINT**

2.     Upon information and belief, Finley is a corporation organized and existing under the laws of the State of Florida, with its principal place of business at 1589 Metropolitan Boulevard, Tallahassee, Florida 32308.

3.     The names and capacities, whether corporate, individual or otherwise, of Defendants named in this complaint as DOES 1 through 10, inclusive, are unknown to Plaintiff. Plaintiff is informed and believes, and thereon alleges, that each of the fictitiously named Defendants are liable to Plaintiff on the causes of action herein alleged and, therefore, Plaintiff sues said Defendants by said fictitious names. Plaintiff will move to amend this complaint when the true names and capacities of said fictitiously named Defendants are ascertained.

4.     All further references to "Finley" or "Defendants" shall include DOES 1 through 10.

5.     The allegations of this Complaint stated on information and belief are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.

## JURISDICTION AND VENUE

6.     This court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1332(a) because Plaintiff and Defendants are citizens of different states and although Plaintiff's damages have not yet been fully ascertained, upon information and belief, his damages and the amount in controversy exceed $75,000.00 exclusive of interest and costs.

7.     Plaintiff is informed and believes, and thereon alleges, that Finley has conducted and does conduct business within the State of California, directly or through intermediaries, offers for sale, sells, and advertises its services in the State of California and the Southern District of California.

8.     Venue is proper in this judicial district under 28 U.S.C. §§ 1391(a).

## MATERIAL ALLEGATIONS

9.     Plaintiff develops and licenses engineering analysis software to assist engineers, designers and builders to construct bridge structures. Plaintiff's MC3D Geometry Control Software ("MC3D Software") aids professionals in modeling the construction of pre-cast segmental box girder bridges.

2
**COMPLAINT**

10.     On or about May 26, 2006, Finley purchased a license from Plaintiff to use the MC3D Software and entered into an agreement for one year of support and maintenance for the MC3D Software.  The purchase price of the MC3D Software was $2,900 per copy and the one year support and maintenance agreement was $600 per year.

11.     On or about May 26, 2006, Plaintiff shipped one copy of the MC3D Software by express courier from San Diego, CA to Finley's office in Tallahassee, FL.  The MC3D Software contained documentation explaining how the software operates ("Software Manual").  The MC3D support and maintenance was provided from Plaintiff's office in San Diego, CA.

12.     Included with the shipment to Finley was an end user license agreement entitled the IDS Single User MC3D Software License Agreement ("License Agreement") (attached as Exhibit 1).  The License Agreement included the following conspicuous notice under the heading "Warranty" in Section 5:

> THE LICENSED SOFTWARE IS PROVIDED "AS IS". IDS OFFERS NO WARRANTY OF ANY KIND, INCLUDING PERFORMANCE, EXPRESS OR IMPLIED, WITH REGARD TO THE LICENSED SOFTWARE AND ALL ACCOMPANYING MATERIALS. IDS FURTHER DISCLAIMS ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE, WITH REGARD TO THE LICENSED SOFTWARE AND ALL ACCOMPANYING MATERIALS.

13.     The License Agreement also included the following Disclaimer of Damages in Section 7:

> You assume responsibility for, among other things, (i) the selection of the Licensed Software to achieve your intended results, (ii) the acquisition of other software (including any programming or operating system software) and/or equipment compatible with the Licensed Software, and (iii) the installation, use and results obtained from the Licensed Software. Further, for the express purpose of limiting the liability against IDS, you agree that, to the maximum extent permitted by law, IDS SHALL IN NO EVENT BE LIABLE FOR ANY DAMAGES WHATSOEVER (INCLUDING WITHOUT

LIMITATION, DAMAGES FOR LOSS OF BUSINESS PROFITS, BUSINESS INTERRUPTION, LOSS OF BUSINESS INFORMATION, OR ANY OTHER PECUNIARY LOSS) ARISING OUT OF THE USE OR INABILITY TO USE THE LICENSED SOFTWARE, WHETHER DIRECT, INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL OR OTHERWISE, REGARDLESS OF THE FORM OF ACTION, EVEN IF IDS HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. (Emphasis in original)

14. The License Agreement includes a choice of law clause in Section 9 that states that the laws of the State of California govern the conduct of the parties.

15. Section 9 of the License Agreement also includes a conspicuous clause that states: "BY INSTALLING AND USING THE SOFTWARE YOU ACKNOWLEDGE THAT YOU HAVE READ THIS AGREEMENT, UNDERSTAND IT AND AGREE TO BE BOUND BY ITS TERMS AND CONDITIONS."

16. By installing and using the MC3D Software, Finley agreed to the terms and conditions of the License Agreement.

17. Finley ordered and received a second license for the MC3D Software on or about July 12, 2006 and Finley ordered and received a third license for the MC3D Software for use by its client Cebus Rimon Industrialized Construction Ltd. ("Cebus Rimon"), on or about August 1, 2006.

18. On information and belief, Finley contracted with Cebus Rimon to provide engineering services for the design of segmental bridges for the Ein Hakoreh Interchange Project Highway 431 in Israel ("Project").

19. On information and belief, Defendants misused the MC3D Software when providing engineering services on the Project by reversing coordinates from the basic assumption of three-dimensional matrix engineering computations. Such an assumption is repeated and illustrated in the Software Manual provided to Finley. The basic assumption of three dimensional geometry computations is one referred to as "right hand rule", usually well known to all civil and structural engineers. Defendants provided input coordinates in a "left hand rule" system of coordinates, thereby violating the basic assumptions of positive elevations upward.

20.    Defendants' error and failure to verify its data led to a design deviation of bridge castings on the Project. According to Cebus Rimon, such deviation led to supplemental costs for the construction of the Project amounting to approximately $200,000.

21.    On or about August 3, 2007, Cebus Rimon sent a letter to Finley (attached as Exhibit 2), which demanded "whole indemnification and compensation by Finley, of any and all damages and losses caused by any breach of the agreement by Finley (including the expert performance undertaking)".

22.    On or about September 13, 2007, Finley sent a demand letter to Plaintiff (attached as Exhibit 3) claiming that Plaintiff is responsible for damages totaling $257,000, including the $200,000 demanded of Finley by Cebus Rimon.

## FIRST CAUSE OF ACTION

### (Trade Libel)

23.    Plaintiff repeats, realleges, and incorporates by reference the allegations set forth in Paragraphs 1 through 22 of this Complaint.

24.    On information and belief, on or about February 9, 2007 and again on June 29, 2007, Finley willfully, without justification, and without privilege communicated to Cebus Rimon and others involved with the Project that the MC3D Software was defective and the MC3D Software was the cause of the design deviation of bridge casting on the Project.

25.    Finley's statements were made of and concerning the Plaintiff's MC3D Software and were so understood by those who heard and read the statements.

26.    Finley's statements disparaged Plaintiff's MC3D Software in that Finley's statements falsely indicated that Plaintiff's MC3D Software was deficient and the cause of a Project design error.

27.    Finley's statements were false.

28.    As a proximate result of Finley's publication of the statements, prospective customers have been deterred from buying Plaintiff's MC3D Software and from otherwise dealing with Plaintiff, and Plaintiff has thereby suffered injury to Plaintiff's business and pecuniary loss in an amount to be proven at trial.

**SECOND CAUSE OF ACTION**

**(Declaratory Relief)**

29.    Plaintiff repeats, realleges, and incorporates by reference the allegations set forth in Paragraphs 1 through 28 of this Complaint.

30.    Plaintiff is informed and believes, and based thereon alleges that an actual controversy has arisen and now exists between Plaintiff on the one part, and Defendants on the other part, in that:

> a. Plaintiff is informed and believes, and based thereon alleges that Defendants claim and contend that Plaintiff's MC3D Software was defective and that Plaintiff is responsible for consequential damages incurred by Defendants totaling approximately $257,000; and

> b. Plaintiff claims to the contrary as any of the alleged damages are the result of Defendants' errors and Defendants agreed before using the MC3D Software that Plaintiff would not be held liable for any pecuniary losses, whether direct, indirect, incidental, consequential, special or otherwise.

31.    This declaration is necessary and appropriate at the present time in order to set at rest the continuing rights, duties, and obligations of the parties with respect to each other without the threat of subsequent legal action by Defendants and in order to avoid a multiplicity of actions.

32.    Plaintiff hereby requests a declaratory judgment in favor of Plaintiff and against Defendants in accordance with its contentions alleged herein.

**REQUESTED RELIEF**

WHEREFORE, plaintiff prays judgment against Defendants, and each of them, as follows:

1. For a compensatory damage award in an amount according to proof;

2. For an order determining the Parties' rights and obligations under the License Agreement;

3. For an order enjoining continued trade defamation by Defendants against Plaintiff;

**COMPLAINT**

4. For interest, costs of suit and fees according to law and proof; and

5. For such other and further relief as the court may deem proper.

**THE TECH LAW GROUP, P.C.**

Dated: October 29, 2007                    By: _____

Jonathan A. Paul
Attorneys for Plaintiff
JEAN-CLAUDE DEMOSTHENIDY
110 West C Street, Suite 2200
San Diego, CA 92101

**DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury on all issues so triable.

**THE TECH LAW GROUP, P.C.**

Dated: October 29, 2007                    By: _____

Jonathan A. Paul
Attorneys for Plaintiff
JEAN-CLAUDE DEMOSTHENIDY
110 West C Street, Suite 2200
San Diego, CA 92101

**COMPLAINT**

**EXHIBIT 1**

MC3Dlicense.txt

IDS Single User MC3D Software License Agreement

IMPORTANT - READ CAREFULLY:  This Single User MC3D
Software License Agreement ("Agreement") is a legal agreement between
you (either an individual or a single entity) and Interactive Design
Systems ("IDS") for IDS's MC3D computer software and associated media
(collectively, the "Licensed Software").  By continuing to use the
Licensed Software, you agree to be bound by the terms of this Agreement.

1. GRANT OF LICENSE EXTENSION

This Agreement grants you (either as an individual or as a single entity)
a limited non-exclusive, non-transferable license to use the Licensed Software
and documentation.  Your right to use the Licensed Software is limited to the
terms and conditions described herein.  You may use the Licensed Software and
associated media solely for your own personal or internal purpose and for no
other purpose:  (a) if you have a single license, on only one computer at a time
and by only one user at a time; (b) if you have acquired multiple licenses, the
Licensed Software may be used either on stand-alone computers or on a computer
network by a number of simultaneous users equal or less to the number than the
number of licenses that you have acquired; and (c) if you maintain the
confidentiality
of the License Software at all times.

2.      COPYRIGHT

The Licensed Software is owned by IDS and is protected by United
States copyright laws and international treaty provisions.  Therefore, you must
treat the Licensed Software like any other copyrighted material (e.g., a book or
musical recording), except that you may either (i) make one copy of the Licensed
Software solely for backup or archival purposes, provided you reproduce and
include IDS's copyright and trademark notices contained on the original
disk labels on such backup copy, or (ii) transfer the Licensed Software to a
single hard disk, provided you keep the original solely for backup or archival
purposes.  You may not copy the written materials accompanying the Licensed
Software.

3.      OTHER RESTRICTIONS

You may not use, copy, or modify the files containing the licensed software, or
any backup copy, in whole or in part, or translate such files into any other
file format or language, except as expressly provided for in this agreement.
You may not rent, lease or sublicense the Licensed Software, and you may not
transfer the Licensed Software and accompanying written materials.  You may not
reverse engineer, decompile or disassemble the Licensed Software for
any purpose whatsoever.

4.      TERM

Your license is effective upon your acceptance of this agreement and
installing the Licensed Software.  You may terminate it at any time by
destroying the Licensed Software together with all copies.  It will also
terminate upon conditions set forth elsewhere in this Agreement or if you
fail to comply with any term or condition of this Agreement.  You agree upon
such termination to destroy all copies of the Licensed Software in any form
in your possession or under your control.

5.      WARRANTY

EXHIBIT 1

MC3Dlicense.txt

THE LICENSED SOFTWARE IS PROVIDED "AS IS".  IDS  OFFERS
NO WARRANTY OF ANY KIND, INCLUDING PERFORMANCE,
EXPRESS OR IMPLIED, WITH REGARD TO THE LICENSED SOFTWARE
AND ALL ACCOMPANYING MATERIALS. IDS  FURTHER DISCLAIMS ALL
OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING BUT NOT
LIMITED TO THE IMPLIED WARRANTIES OF MERCHANTABILITY AND
FITNESS FOR A PARTICULAR PURPOSE, WITH REGARD TO THE
LICENSED SOFTWARE AND ALL ACCOMPANYING MATERIALS.


6.      CUSTOMER REMEDY

IDS DISCLAIMS ALL LIABILITY AND OFFERS NO CUSTOMER
REMEDY WITH REGARD TO THE LICENSED SOFTWARE AND ALL
ACCOMPANYING MATERIALS

7.      DISCLAIMER OF DAMAGES

You assume responsibility for, among other things, (i) the selection of
the Licensed Software to achieve your intended results, (ii) the acquisition of
other software (including any programming or operating system software) and/or
equipment compatible with the Licensed Software, and (iii) the installation, use
and results obtained from the Licensed Software.  Further, for the express
purpose of limiting the liability against IDS, you agree that, to
the maximum extent permitted by law, IDS  SHALL
IN NO EVENT BE LIABLE FOR ANY DAMAGES WHATSOEVER
(INCLUDING WITHOUT LIMITATION, DAMAGES FOR LOSS OF
BUSINESS PROFITS, BUSINESS INTERRUPTION, LOSS OF
BUSINESS INFORMATION, OR ANY OTHER PECUNIARY LOSS)
ARISING OUT OF THE USE OR INABILITY TO USE THE LICENSED
SOFTWARE, WHETHER DIRECT, INDIRECT, INCIDENTAL,
CONSEQUENTIAL, SPECIAL OR OTHERWISE, REGARDLESS OF THE
FORM OF ACTION, EVEN IF IDS HAS BEEN
ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.


8.      UPDATES & TECHNICAL SUPPORT

IDS will make available to you Technical Support for
this copy of the Licensed Software.  IDS may, from
time to time, revise or update the Licensed Software.  In so doing,
IDS incurs no obligation to furnish such revision or updates to you.

9..     GENERAL

This License is personal between you and IDS.  It is not transferable
and any attempt by you to rent, lease, sublicense, assign or transfer any of
the rights, duties or obligations hereunder, except as provided in Section 3,
above, is void.  This Agreement and the conduct of the parties hereto shall be
governed by the laws of the State of California.

BY INSTALLING AND USING THE SOFTWARE YOU ACKNOWLEDGE THAT YOU HAVE READ THIS
AGREEMENT, UNDERSTAND IT AND AGREE TO BE BOUND BY ITS TERMS AND CONDITIONS.
YOU FURTHER AGREE THAT IT IS THE COMPLETE AND EXCLUSIVE STATEMENT OF THE
AGREEMENT BETWEEN YOU AND IDS WHICH SUPERSEDES ANY
PROPOSAL OR PRIOR AGREEMENT, ORAL OR WRITTEN, AND ANY OTHER
COMMUNICATIONS BETWEEN YOU AND IDS OR IDS 'S
AGENT(S) RELATING TO THE LICENSED SOFTWARE.

EXHIBIT 1



**סיבוס רימון** בנייה תעשייתית רע"מ   **Cebus Rimon** Industrialized Construction Ltd.

Subsidiary of Africa Israel Investments Ltd.    מקבוצת אפריקה ישראל להשקעות בע"מ

To
August 03, 2007
Mr. Craig Finley, Jr., P.E., President
Finley Engineering Group, Inc.
1589 Metropolitan Boulevard, Tallahassee, FL 32308-3776
USA

Dear Craig,

### Re: <u>Ein Hakoreh Interchange Project Highway 431 – Costs Report</u>

1. Attached please find, a cost report with respect to Cebus Rimon (hereinafter – "Cebus") costs and damages caused as a result of the software deficiencies, software which was provided by Finley to Cebus (IDS' software) in the framework of the 431 Project (hereinafter - the "Project"). Cebus Damages and expenses, till the date hereof, summarized to a sum of 929,985 NIS. Please note that such damages may increase, once the final costs, which continue to be borne by Cebus, are assessed.

2. According to the signed agreement, Cebus shall be entitled for full and whole indemnification and compensation by Finley, of any and all damages and losses caused by any breach of the agreement by Finley (including the expert performance undertaking).

3. In regards to your letter, dated June 29, 2007 please note, that without detracting from any claim or demand of Cebus with respect to the performance of the software, there is no reason from Cebus' point of view, not to renew the yearly maintenance and support for the MC3D licensed by Finley, in order to enable Cebus to receive the required continuing services as to the agreement signed between our companies, and in order to prevent any further unnecessary damages and disturbance to the works in the Project.

4. Furthermore, based on the current situation, Cebus has no other options except for renewing the maintenance of the software, to prevent further damages, as aforementioned.

5. Nevertheless, Cebus rejects any attempt of IDS, to raise any unfounded claims such as "misuse", "misunderstanding" etc, as raised in IDS' 13th of July letter. Such claims are denied by Cebus, with no exceptions.



אזור תעשייה צפוני לוד. טל': 08-9232270 פקס: 08-9232327
Northern Ind. Zone, Lod. Tel: 972-8-9232270 Fax: 972-8-9232327
E-mail: danya@danya-cebus.co.il    Web Site: www.danya-cebus.com
1003 - letter to finley - IDS (2).doc

**EXHIBIT 2**



**סיבוס רימון    Cebus Rimon**
Industrialized Construction Ltd.
מקבוצת אפריקה ישראל להשקעות בע"מ
Subsidiary of Africa Israel Investments Ltd.

6  As you well know, the deficiencies in the relevant works occur directly as a result of defects in such software provided to Cebus. Furthermore, the relations and disagreements between Finley and its subcontractors (such as IDS), are not relevant to Finley-Cebus' agreement whatsoever, since such relations have no bearing on Finley's comprehensive guarantee undertaking of such services to Cebus.

7  Please note, that the continued validity of the agreement between the parties is beyond any doubt and therefore Finley is expected and obliged to keep providing the services under the agreement.

8  Awaiting for your quick response regarding the attached cost report.

9  Nothing in this letter shall be deemed or construed as a waiver of any additional claims that Cebus may have in connection with the Project.

Sincerely yours,

Cebus Rimon Industrialized Construction Ltd.






---

EXHIBIT 2

# Ein Hakoreh Interchange Project Highway 431

## Supplemental Costs Report resulting from a design error in Bridge B21

EXHIBIT 2

**Description of the project:**

Construction of an interchange as part of Highway 431, which included 9 bridges, of which 4 were segmental bridges.

Designer of the segmental bridges: Finley Group, US.

Design of the foundations and piers up to the segmental level: Shamir Posner Brown – Ronen Brown

Segmental bridges

B20 – bridge length 192 m

B21 – bridge length 194 m

B22 – bridge length 307 m

B23 – bridge length 267 m

Width of all the bridges – 12 m.

**Description of the method used for the construction of segmental bridges**

Plant fabrication

The method is based on the construction of the bridge superstructure using elements produced under full control conditions at a precast fabricating plant.

The elements weigh between 50 tons and 70 tons and have dimensions of 300 cm to 12000 cm and a height of 2700 cm. They are produced in a special form fabricated for the purpose of casting of the segments using a sophisticated method according to the order of assembly in the field and according to coordinates that provide the form and final superposition as intended in the field after assembly.

For this purpose, the plant uses software that also provides coordinates and heights of the form prior to casting.

This software is called MC3D and was supplied by Finley, the bridge designer.

Assembly in the field

Following completion of the installation of the piers in the field (the columns and abutments), the assembly process is accompanied by the use of a large tracked crane with a suitable lifting capacity and another auxiliary crane.

The assembly process is also accompanied by an on-site surveyor who routinely checks the assembly location of two symmetrical elements and compares it to the tables have been supplied by the designer that provide both the coordinates and the heights of each element according to stage of assembly.

Description

As the assembly process of Bridge B21 which began on January 8, 2007 progressed, and the assembly of Column C in particular, we found that there was a deviation from the design with respect to the tables that were supplied by the designer.

This deviation increased as assembly of that column progressed. We advised the designer of the essence of the problem and transmitted to him the heights that were obtained as the assembly progressed.

**EXHIBIT 2**

At first, the designer did not accept our claims that there was a problem and recommended that we check again.

Following completion of the assembly on Column C, we could see that there was a serious problem that could not be solved and investigated the reason for it.

On February 9, 2007, a meeting with the designer was called and we shared our thoughts with him regarding the reason for the problem. In that same conversation, he agreed that there was a problem in the software that was supplied to the segment fabricating plant and recommended discontinuing with assembly of Bridge B21 until the issue was checked and a decision made as to how to proceed.

The status of the fabrication of the segments on (date) was that all of the elements for Bridges 21 and 22 were cast.

Some of the elements for Column B on Bridge 23 had been cast.

The situation in the field was that the support tower and hydraulic jacking system were prepared for Column D.

After it was decided that we could not continue with the assembly of this bridge, and in order to save time and to avoid equipment downtime

We decided to dismantle the tower and the jacking system for Column D on Bridge 21 and to move on to Column B of Bridge 22.

This is after it we received approval from the designer that we could begin the assembly of this column.

We progressed with the assembly of Columns A and B on Bridge 21, but since the fact that the two towers were being used, the first on Column C of Bridge 21 and the second on Column B of Bridge 22, a second stoppage of the assembly works was caused from February 27, 2007 through March 7, 2007. This caused downtime of assembly equipment and work crews, and of the survey team.

On February 18, 2007, Gary arrived in Israel in order to explain the error that had occurred and to present a solution.

Four days of marathon meetings were held with the designer Ronen Brown and his segmental bridge construction consultant Mr. Shmuel Motts, Nati's representative from the Design Department Mr. Yehuda Dogesh and the builder's Project Manager Yosef Rock.

On February 21, 2007, the conclusion was reached that what needed to be done, with the understanding that there were few options for correcting the error, was that we had to change the red line (the height of the asphalt) specifically on Bridge B21.

This brought about a change in the profile of the nosing, increasing it, and making it more complicated to construct, with a variable longitudinal cross-section. It also required use of a special form that needed to be manufactured specially for this bridge in addition to what we were required to prepare.

The additional load that was caused as a result of thickening of the asphalt layer changed the quantity of exterior stressing cables, which also constituted a certain addition [to the work].

EXHIBIT 2

Because of the deviation that accompanied us from the beginning of the assembly, we had to insert shims (20 x 20 cm x 2 mm thick sheetmetal plates) based on the designer's approval. This brought about the use of an additional quantity of glue that is spread between the segments, something that also brought about additional expenses for labor and materials.

EXHIBIT 2

# Summary of additional costs that were caused as a result of a design error in the segmental bridges

### 1.  Additional costs as a result of stoppage of the work.

a.  From the date of the stoppage of the work on Bridge B21 to its renewal on Bridge B22.

- The work on bridge B21 was stopped on February 6, 2007 and renewed on Bridge B22 on February 14, 2007 (a total of seven downtime days of a CC1000 crane, a T55 auxiliary crane, a crew of 11 workers, a foreman, an engineer and a surveyor).

b.  The second stoppage, because two of the towers were in use on two bridges (Column C of Bridge the 22 and Column B of Bridge B22).

- The work on Column B of Bridge B22 ended on February 27, 2007 and was renewed on Bridge B21 on March 7, 2007 following the moving of the tower (a total of six days of downtime for a CC1000 crane, a T55 auxiliary crane, a crew of 11 workers, a foreman, an engineer and a surveyor).

c.  Equipment movement costs Bridge B21 to Bridge 22 and their return after renewal of the work on Bridge B21

- In order to begin work on Bridge B22, there was a need to transfer a large amount of equipment from Bridge B21: stressing equipment: jacks, insertion machines, stressing bars, stressing cables (drums), auxiliary equipment used in assembly – spacers, ratchet chains, glue and mixing equipment, electrical feed: 5 laborers + foreman + 2 crane trucks (T85, T55) for a period of 3 days.

- During the work on two bridges simultaneously, there was need to perform exterior stressing and grouting of the cables for the two bridges.  Therefore, the grouting machine, cement bags, grouting material and exterior stressing equipment was moved.

> Total cost:  NIS 257,800

### 1    Additional costs as a result of stoppage of the work

| Based on Item | Resource | Units | Qty | Unit price | Total | Comments |
|---|---|---|---|---|---|---|
| A, B | CC 1000 crane | Days | 13 | 5,000 | 65,000 | February 6-14, February 27-March 7 |
| A, B, C | T55 crane truck | | 16 | 2,200 | 35,200 | Item C movement of equipment, February 6-14, February 27-March 7 |
| A, B, C | Workers | Hours | 1,760 | 55 | 96,800 | 16 days x 11 workers x 10 hours |

**EXHIBIT 2**

| | | | | | | |
|---|---|---|---|---|---|---|
| A. B. C | Foreman | Days | 16 | 1,200 | 19,200 | Item C movement of equipment, February 6-14, February 27-March 7 |
| A, B | Engineer | Days | 13 | 1,200 | 15,600 | February 6-March 7 |
| A. B | Survey team | Days | 13 | 2,000 | 26,000 | February 6-14, February 27-March 7 |
| | **Total** | | | | **257,800** | **NIS** |

## 2.  Overhead – design works

During the week between February 18, 2007 and February 23, 2007, Finley's representative arrived in Israel and meetings were held with the participation of Shmuel Mottes. the on-site consultant for the segmental bridges. the representative of Netivei Hayovel, Yehuda Dougach and the representative of Danya Cebus, Yosef Rock.

| Total cost: NIS 90,000 |
|---|

*2*  Design costs

| Name of consultant | Work days | Hours per day | Hourly cost | Total | Comments |
|---|---|---|---|---|---|
| Shmuel Mottes | 5 | 10 | 600 | 30,000 | |
| Yehuda Dougach | 5 | 10 | 600 | 30,000 | |
| Yosef Rock | 5 | 10 | 600 | 30,000 | |
| **Total** | | | | **90,000** | **NIS** |

## 3.  Additional auxiliary works

a.  Moving of the towers not in accordance with plan, assembly of the tower on Column D of Bridge B21, including the hydraulic jacking system and its disassembly after the problem was discovered. After being requested not to continue with the work on Bridge B21, it was decided to move the tower to Column B of Bridge B22.

- Transfer of the bridge took place on February 12-14 from Column D of Bridge B21 to Column B of Bridge B22.

| Total cost: NIS 25,700 |
|---|

*3*  ## Additional auxiliary works

| Resource | Units | Qty | Unit price | Total | Comments |
|---|---|---|---|---|---|
| Moving of the tower | Units | 1 | 8,500 | 8,500 | Contractor price |
| Two T55 crane trucks | Days | 2*3 | 2,200 | 13,200 | Moving of the towers |

**EXHIBIT 2**

| Steps | Complete | 1 | 4,000 | 4,000 | Moving of the stepped scaffolding |
|---|---|---|---|---|---|
| **Total** | | | | 25,700 | **NIS** |

## 4. Changes in the piers

As a result of the error that was caused, it was decided to change the heights of the bridge. We were therefore requested to change Column E by increasing its height.

On Column D, we were requested to change the height of the bracket after its construction.

a. Column E - raising the height of the column by an additional casting of 26.5 m³ of concrete.

> Total cost: NIS 72,105

b. Change in Column D – insertion of dowels and increasing the height of the brackets for the supports by roughening of the existing concrete and executing a supplemental casting over the existing brackets.

> Total cost: NIS 20,950

*4A*    **Costs resulting from changes in Column E**

| Resource | Units | Qty | Unit price | Total | Comments |
|---|---|---|---|---|---|
| Reinforcing steel | Tons | 6.6 | 3,000 | 19,800 | |
| Labor – reinforcing steel | Tons | 6.6 | 1,000 | 6,600 | |
| T55 crane truck | Days | 4 | 2,200 | 8,800 | |
| Concrete | Cu. m. | 26.5 | 350 | 9,275 | |
| Labor – concrete | Cu. m. | 26.5 | 620 | 16,430 | |
| Foreman | Days | 3 | 1,200 | 3,600 | |
| Engineer | Days | 3 | 1,200 | 3,600 | |
| Surveyor | Days | 2 | 2,000 | 4,000 | |
| **Total** | | | | **72,105** | **NIS** |

*4B*    **Costs resulting from changes in Column D**

| Resource | Units | Qty | Unit price | Total | Comments |
|---|---|---|---|---|---|
| Labor | Hours | 90 | 55 | 4,950 | 3 workers x 3 days x 10 hours |
| Surveyor | Days | 1 | 2,000 | 2,000 | Re-marking + checking prior to casting |

**EXHIBIT 2**

| Foreman | Days | 1 | 1,200 | 1,200 | |
| Sikadur 42 | Kg | 120 | 60 | 7,200 | |
| Crane truck | Days | 2 | 2,200 | 4,400 | |
| Engineer | Days | 1 | 1,200 | 1,200 | |
| **Total** | | | | **20,950** | **NIS** |

5. **Additional shims used in all of the bridges:**

Shims were added according to the designer's instructions, including thickening of the glue layer between the segments with Sikadur 42 for attempting a correction of the deviation that was created.

a.  Sikadur 42 glue: addition of three containers (18 kg) to the segment.

> Total cost: NIS 52,920

5A  **Cost of additional materials as the result of the insertion of the shims**

| Resource | Units | Qty | Unit price | Total | Comments |
| --- | --- | --- | --- | --- | --- |
| Sikadur 31 glue | Kg | 1260 | 42 | 52,920 | 70 segments x 3 containers x 6 kg/container A repair booklet from Finley + surveys and location of the shims is attached. |
| **Total** | | | | **52,920** | **NIS** |

b.  Additional work time the purpose of insertion of the shims and spreading of the glue.
     Additional work hours: 30 minutes per segment x 6 workers.
     CC 1000 Crane, managers, surveyor.

> Total cost: NIS 52,150

5B  **Costs as a result of the insertion of shims**

| Resource | Units | Qty | Unit price | Total | Comments |
| --- | --- | --- | --- | --- | --- |
| Workers | Hours | 210 | 55 | 11,550 | 6 workers x 30 minutes x 70 segments |
| T55 crane truck | Days | 3.5 | 2,200 | 7,700 | 30 minutes x 70 segments |
| CC 1000 crane | Days | 3.5 | 5,000 | 17,500 | 30 minutes x 70 |

**EXHIBIT 2**

| | | | | | segments |
|---|---|---|---|---|---|
| Foreman | Days | 3.5 | 1,200 | 4,200 | 30 minutes x 70 segments |
| Engineer | Days | 3.5 | 1,200 | 4,200 | 30 minutes x 70 segments |
| Surveyor | Days | 3.5 | 2,000 | 7,000 | 30 minutes x 70 segments |
| **Total** | | | | **52,150** | **NIS** |

There were 70 segments in which the shims were inserted: 40 were inserted prior to the Finley's design of the correction + 30 were inserted to correct deviations that were created after surveying.

## 6.   Cost/damage caused to the plant

6   Damages that were caused to the plant

| Resource | Units | Qty | Unit price | Total | Comments |
|---|---|---|---|---|---|
| Site Manager | Hours | 60 | 140 | 8,400 | For checking of the survey material |
| Survey team | Hours | 60 | 250 | 15,000 | Surveys, checking of deviations, new versions of the software |
| Work stoppage | Hours | 165 | 50 | 8,250 | 15 workers x 11 hours |
| **Total** | | | | **31,650** | **NIS** |

## 7.   Redesign of the red line
Elements + fill material on both sides of the bridge.

7   Redesign of the red line

| Resource | Units | Qty | Unit price | Total | Comments |
|---|---|---|---|---|---|
| Asphalt | Tons | 580 | 212 | 122,960 | |
| Redesign – red line + quality control | Complete | 1 | 97,000 | 97,000 | |
| **Total** | | | | **219,960** | **NIS** |

EXHIBIT 2

8. **Stressing of Bridge B21: additional stressing cables as a result of the addition to the design weight – additional dead weight (asphalt)**

   a.   Additional cables: T18 - 17.4 m x 2 sides x 6 cables x 1.2 kg per meter

   b.   Addition of a #19 anchor in place of a 2 x #13 anchor.

   c.   Additional labor: 5 workers x 1.5 workdays.

   Total cost:  NIS 7,350

*8*   **Additional stressing cables**

| Resource | Units | Qty | Unit price | Total | Comments |
|---|---|---|---|---|---|
| Cables | Tons | 0.2506 | 3,915 | 981 | |
| 19 anchor instead of 13 anchor | Units | 2 | 222 | 444 | Price differential = 752-520 |
| Workers | Hours | 75 | 55 | 4,125 | 5 workers x 1.5 days |
| Foreman | Days | 1.5 | 1,200 | 1,800 | |
| **Total** | | | | **7,350** | **NIS** |

9. **Special form for the Bridge B21 nosing**

   a.   Addition of 4 forms – $2500 per form.

   b.   Additional labor: 1 month x 4 workers for the extra time required for preparing a nosing with a variable cross-section for construction.

   c.   Addition of 5 $m^3$ of concrete + pumper truck.

   Total cost: NIS 91,400

*9*   **Bridge B21 nosing**

| Resource | Units | Qty | Unit price | Total | Comments |
|---|---|---|---|---|---|
| Nosing form | Meters | 20 | 1,720 | 34,400 | |
| Workers | Hours | 1,000 | 55 | 55,000 | 25 workdays x 10 hours x 4 workers |
| Concrete + pumper | Cu. m. | 5 | 400 | 2000 | |
| **Total** | | | | **91,400** | **NIS** |

EXHIBIT 2

10. **Surveyor: workdays for the surveying crew**

    a.    Re-checking of the entire bridge after discovery of the error – 2 workdays.

    b.    Checking during repair work. On February 21. 2007 – 1 workday.

    c.    Re-checking of the entire bridge following the repair – 1 workday.

| Total cost: NIS 8,000 |
| --- |

*10*  **Workdays for the surveying crew**

| Resource | Units | Qty | Unit price | Total | Comments |
| --- | --- | --- | --- | --- | --- |
| Re-checking of the entire bridge | Days | 4 | 2000 | 8,000 | |
| **Total** | | | | **8,000** | **NIS** |

### Cost Summary Table

| | Item | Cost | Comments |
| --- | --- | --- | --- |
| **1** | Downtime due to work stoppage | 257,800 | |
| **2** | Design costs | 90,000 | |
| **3** | Additional auxiliary works | 25,700 | |
| **4A** | Costs resulting from changes in Column E | 72,105 | |
| **4B** | Costs resulting from changes in Column D | 20,950 | |
| **5A** | Costs as a result of the insertion of shims | 52,920 | |
| **5B** | Costs as a result of the insertion of shims | 52,150 | |
| **6** | Damages that were caused to the plant | 31,650 | |
| **7** | Redesign of the red line | 219,960 | |
| **8** | Additional stressing cables | 7,350 | |
| **9** | Bridge B21 nosing | 91,400 | |
| **10** | Workdays for the surveying crew | 8,000 | |
| | **Total** | **929,985** | **NIS** |



EXHIBIT 2

EXHIBIT 3

## GUILDAY, TUCKER, SCHWARTZ & SIMPSON, P.A.

ATTORNEYS AND COUNSELORS AT LAW

1983 CENTRE POINTE BOULEVARD, SUITE 200

TALLAHASSEE, FLORIDA 32308

P.O. BOX 12500

TALLAHASSEE, FLORIDA 32317-2500

www.guildaylaw.com

TEL: (850) 224-7091

FAX: (850) 222-2593

THOMAS J. GUILDAY
SHAWN M. HEATH*
GEOFFREY B. SCHWARTZ
MARY K. SIMPSON
J. KENDRICK TUCKER
CLAUDE R. WALKER†
MICHAEL D. WEST

J. CELESTE S. BURNS
LINDSAY L. CARTER
CATHERINE B. CHAPMAN**
DANIEL J. KUHN
MARC A. PEOPLES
JAKEN E. ROANE
ALBERT J. WOLLERMANN

*ALSO ADMITTED IN LA
**ALSO ADMITTED IN GA
†BOARD CERTIFIED REAL ESTATE LAWYER

September 13, 2007

Mr. Jean-Claude Demosthenidy                                    *Certified Mail/Return Receipt*
Interactive Design Systems
16885 Via Del Campo Court, Suite 207
San Diego, CA 92127

      RE:    Use of MC3D Software by Finley Engineering Group, Inc. on
               EinHakoreh Interchange (Israel)

Dear Mr. Demosthenidy:

      This firm represents Finley Engineering Group, Inc. As you have previously been made aware by representatives of Finley Engineering Group, Inc. ("Finley"), use of MC3D Software by Finley to design and construct bridge segments on the Ein Hakoreh Interchange (Israel) project resulted in defective casting of a number of bridge segments. This caused added cost, inconvenience and delay to the project. These costs are now the subject of a demand by the contractor, Danya, against Finley. Additionally, Finley has incurred substantial expense in investigating the software deficiency and correcting the problems related to the miscast segments.

      Responsibility for these costs is clearly with your company. Investigation revealed that proper use of the software resulted in misorientation of the cast segment because of a defect in the software program. Obviously, this was known to MC3D, as a "patch" was provided to Finley after this problem was identified. We have subsequently learned that the defect in the development of the software had previously surfaced on another project presumably resulting in the repair "patch." It is hard for Finley to understand why this "patch" was not provided once your company became aware of the problem. In any event, responsibility for Finley's losses and those of its client, Danya, are clearly your company's. We must therefore demand that your company immediately agree to indemnify Finley and assume full responsibility for the costs which have been incurred in identifying the software problem and remedying the consequences.

EXHIBIT 3

Mr. Jean-Claude Demosthenidy
September 13, 2007
Page 2

The amounts which Finley seeks from your company are the following:

|    |                                                                              | Est. USD |
|----|------------------------------------------------------------------------------|----------|
| A. | Danya-Cebus claim (929,985 NIS) (see attached claim of Danya-Cebus)          | $   200,000 |
| B. | Remedial engineering fees – Finley                                           | 47,000 |
| C. | Attorneys fees and costs (estimated)                                         | 10,000 |
|    | TOTAL                                                                         | $   257,000 |

Finley hereby demand information be provided, including the name of any insurer providing coverage and the amount of coverage, pursuant to section 627.4137, Florida Statutes. This information must be provided within thirty (30) days.

In conclusion, Finley must receive an immediate response from your company which is responsive to this demand. At a minimum, we must be provided:

A. Interactive Design Systems' ("IDS") commitment to respond to the losses which have been incurred;

B. Identification of insurance coverage, if any.

If no response is received, we will assume that IDS intends to ignore its responsibilities. In that event, we will be forced to undertake reasonable steps to protect our client. We look forward to hearing from you.

Sincerely,

Thomas J. Guilday
Marc A. Peoples

TJG/cj

EXHIBIT 3

**UNITED STATES
DISTRICT COURT**
SOUTHERN DISTRICT OF CALIFORNIA
SAN DIEGO DIVISION

**# 143802     — SR**

**October 29, 2007
13:25:46**

**Civ Fil Non-Pris**
USAO #.: 07CV2050 CIV. FIL.
Judge..: WILLIAM Q HAYES
Amount.:                    $350.00 CK
Check#.: BC#1066

**Total—>  $350.00**

FROM: DEMOSTHENIDY V. FINLEY ENGINEE
      DOES 1 - 10, CIVIL FILING

**JS 44** (Rev. 11/04)

## CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| JEAN-CLAUDE DEMOSTHENIDY, an individual doing business as INTERACTIVE DESIGN SYSTEMS | FINLEY ENGINEERING GROUP, INC., a Florida corporation; DOES 1 through 10, inclusive |

**(b)** County of Residence of First Listed Plaintiff  SAN DIEGO
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant  LEON
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
THE TECH LAW GROUP, P.C.
110 West C St., Suite 2200, San Diego, CA 92101  (619) 881-2305

Attorneys (If Known)  '07 CV 2050 WQH (BLM)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☐ 2 U.S. Government Defendant
- ☐ 3 Federal Question (U.S. Government Not a Party)
- ☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

**CONTRACT**
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

**REAL PROPERTY**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**TORTS**
PERSONAL INJURY
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☒ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury

PERSONAL INJURY
- ☐ 362 Personal Injury - Med. Malpractice
- ☐ 365 Personal Injury - Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**CIVIL RIGHTS**
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 444 Welfare
- ☐ 445 Amer. w/Disabilities - Employment
- ☐ 446 Amer. w/Disabilities - Other
- ☐ 440 Other Civil Rights

**PRISONER PETITIONS**
- ☐ 510 Motions to Vacate Sentence
Habeas Corpus:
- ☐ 530 General
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

**FORFEITURE/PENALTY**
- ☐ 610 Agriculture
- ☐ 620 Other Food & Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 R.R. & Truck
- ☐ 650 Airline Regs.
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

**LABOR**
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Mgmt. Relations
- ☐ 730 Labor/Mgmt.Reporting & Disclosure Act
- ☐ 740 Railway Labor Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Empl. Ret. Inc. Security Act

**BANKRUPTCY**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

**SOCIAL SECURITY**
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Sat TV
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 895 Freedom of Information Act
- ☐ 900 Appeal of Fee Determination Under Equal Access to Justice
- ☐ 950 Constitutionality of State Statutes

## V. ORIGIN (Place an "X" in One Box Only)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S.C. Section 1332(a) (Diversity)
Brief description of cause:
Plaintiff has been damaged by false and unprivileged statements published by Defendants

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $ Greater then $75,000
CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY
(See instructions): JUDGE ___ DOCKET NUMBER ___

DATE 10/29/2007

SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY

RECEIPT # 143802  AMOUNT $350.  APPLYING IFP ___ JUDGE ___ MAG. JUDGE ___

10/29/07